**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **TWILA DAWN JOHNSON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Case No. 13-CV-144-PJC** |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of the** | ) |
| **Social Security Administration,[1]** | ) |
| | ) |
| **Defendant.** | ) |

**OPINION AND ORDER**

Claimant, Twila Dawn Johnson ("Johnson"), pursuant to 42 U.S.C. § 405(g), requests

judicial review of the decision of the Commissioner of the Social Security Administration

("Commissioner") denying her applications for disability insurance and supplemental security

income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*.  In accordance with 28

U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States

Magistrate Judge.  Any appeal of this order will be directly to the Tenth Circuit Court of

Appeals.  Johnson appeals the decision of the Administrative Law Judge ("ALJ") and asserts that

the Commissioner erred because the ALJ incorrectly determined that she was not disabled.  For

the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's

decision.

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting
Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as
Defendant in this action.  No further action need be taken to continue this suit by reason of the
last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**Claimant's Background**

Johnson was 27 years old when she testified at the hearing before the ALJ on December 6, 2011.  (R. 34, 41).  She had four years of college and two credit hours towards a master's degree in business administration.  (R. 38-39).  She had last worked part-time at a movie theater.  (R. 39-40).  At this job, Johnson's physical needs had been accommodated through being scheduled for fewer hours and being allowed frequent absences.  (R. 47-48).  When she was not feeling well, she was assigned to work in the box office.  (R. 48).  In the box office, she had fewer duties, she could take more breaks, and she could sit down.  (R. 47).  She was able to work for one hour in the box office before she needed to take a break.  *Id.*  During her breaks, Johnson reclined in a chair for twenty minutes.  *Id.*  She had been terminated from the job at the movie theater, and she was told the termination was because they could no longer accommodate her needs.  (R. 36-37).

Johnson testified that she was unable to work due to symptoms from lupus.  (R. 41-43).  She said that lupus caused her chronic pain, swelling of her joints and limbs, and fatigue.  (R. 41-42).  Johnson reported that she had episodes when her lupus symptoms flared up and made her "really, really sick."  (R. 43-44).  Her flare-ups lasted from one day to two weeks and sometimes caused her to have migraine headaches.  (R. 44-45).  Increased physical exertion, including working more than three days a week, caused a flare-up.  (R. 43-44, 46).

Johnson said that she had difficulty getting to work on time because of her fatigue.  (R. 43).  She had difficulty getting up in the morning when her symptoms flared up because of increased fatigue and pain.  (R. 44-45).  Other than going to the restroom, Johnson stayed in bed during her flare-ups.  (R. 44).  Johnson's fatigue affected her ability to focus and to concentrate

2

during her flare-ups.  (R. 44).  Her fatigue made her feel foggy, hazy, and confused, and she was unable to complete work tasks when this occurred.  (R. 44-45).

Johnson testified that she had difficulty using her hands due to swelling.  (R. 44, 49-50). She was unable to bend, move, or use her hands when they were swollen.  (R. 44).  She was able to type for 20 minutes before her hands would start to feel achy.  (R. 50-51).  Her hands stayed swollen for two weeks out of the month.  (R. 50)

Johnson said that she had been "hurting a lot more recently."  (R. 49).  She spent 75 percent of her day either lying down or reclining in a chair.  *Id.*  She said that using the restroom and eating made her feel tired.  *Id.*  Johnson said that showering was a "planned event" because it was so fatiguing.  (R. 52).  After showering, Johnson had to lie down to rest for a couple of hours.  *Id.*  Washing her hair increased her pain, so she was planning to get it cut shorter.  (R. 49).  Johnson testified that other than getting out of bed in the morning, showering was the hardest thing that she had to do.  (R. 52).  She said that she felt "lucky" if she were physically able to take a shower twice a week.  *Id.*

Johnson said that she had difficulty maintaining any activity for a prolonged period of time.  (R. 43).  Due to her problems with fatigue, she did not cook, and she had difficulty doing the dishes.  (R. 49-50).  Johnson usually made cereal for breakfast, but her roommates had to help her on a "bad day."  (R. 49-50).  Her roommates helped her with the laundry, shopping, and cleaning.  (R. 44, 47, 52).  She had to take breaks when she shopped, and she would go to her car to lie down.  (R. 52-53).  Johnson estimated that she could frequently lift three pounds and occasionally lift five pounds.  (R. 46, 50).  She could take a light 30-minute walk once or twice a week, but it would take her a long period of time to recover.  (R. 43).  She could sit for 20 minutes before needing to shift positions and to lean against something.  (R. 51).

3

Johnson's medical records reflect a rheumatology evaluation by Sara L. Newell, M.D. at Warren Clinic on January 25, 2008.  (R. 336-37).  On examination, Johnson had tenderness in all of her joints and a limited range of motion of her neck and spine.  (R. 337).  Dr. Newell's assessments were UCTD,[2] bronchitis, and asthma.  *Id.*  Johnson was prescribed Darvocet and Plaquenil.[3]  (R. 336).

Johnson was seen by a physician's assistant at Oklahoma University Alliance for Community Health (the "OU Clinic") on May 15, 2009.  (R. 329-32).  She complained that she had problems sleeping.  (R. 330).  Johnson had lost her insurance and had not been able to follow up with Dr. Newell.  *Id.*  Johnson reported that Plaquenil had not helped her symptoms and that she had run out of pain medication.  *Id.*  Connie Lane, M.D. at the OU Clinic evaluated Johnson on May 22, 2009.  (R. 324-28).  Johnson told Dr. Lane that she hurt everywhere and was tired all the time.  (R. 325).  Johnson reported that her pain was predominately in her knees, feet, and in her right hand.[4]  *Id.* Dr. Lane's assessment was lupus erythematosus, but she included a

---

[2] Johnson was apparently an established patient of Dr. Newell's at the time of the January 25, 2008 office visit, and Dr. Newell used the "UCTD" abbreviation without any spelling out of her assessment.  When Dr. Newell saw Johnson again on May 3, 2010, Dr. Newell stated her impression as "[unspecified] diffuse connective tissue disease."  (R. 334).  Dr. Lane, however, spelled this out as "undifferentiated connective tissue disease" when she saw Johnson as a new patient on May 22, 2009.  (R. 328).  For ease of reference, the Court will refer to both of these diagnoses as "UCTD."

[3] Plaquenil is a medication that is used to treat discoid and systemic lupus erythematosus, rheumatoid arthritis, and malaria.  www.pdr.net.

[4] Dr. Lane specified that the pain was in Johnson's right third proximal interphalangeal joint.  (R. 325).  For ease of reference, the Court will simply refer to this as hand pain.

discussion of systemic lupus erythematosus[5] and Dr. Newell's previous diagnosis of UCTD.  (R. 328).  Dr. Lane prescribed a pain medication and a sleep aid.  *Id.*

On June 5, 2009, Dr. Lane discussed results of lab tests with Johnson, and she said that the results were "suggestive of an autoimmune disorder," but Johnson did not meet the criteria for a diagnosis of systemic lupus erythematosus.  (R. 314-16).  Dr. Lane changed her diagnosis to UCTD, and she added a diagnosis of dyslipidemia.[6]  (R. 315).  She prescribed Mobic for pain and phentermine to address Johnson's fatigue.  (R. 315-16).

On August 7, 2009, Johnson told Dr. Lane that after a couple of weeks of adjustment to her new medications, she had begun to "feel and function remarkably well."  (R. 311-13).  Johnson had then run out of medications, and her symptoms had returned.  (R. 312).  On October 9, 2009, Johnson reported that she had been doing well until a week before the appointment, when her job changed to one that was more fast paced.  (R. 308-10).  Her pain had increased at that time.  (R. 308).  Dr. Lane said that Johnson's affect did not reflect the level of distress that she conveyed in words.  (R. 309).  Regarding the diagnosis of UCTD, Dr. Lane noted that she had never seen clinical findings for this diagnosis except for the "abnormal lab studies."  *Id.*

---

[5] Systemic lupus erythematosus is defined as "[a] chronic inflammatory disease of connective tissue that causes injury to the skin, joints, kidneys, nervous system, and mucous membranes." *Taber's Cyclopedic Medical Dictionary* 1139 (17th ed. 1993).

[6] Dyslipidemia is defined as "abnormality in, or abnormal amounts of, lipids and lipoproteins in the blood.  *Dorland's Illustrated Medical Dictionary* 586 (29th ed. 2000).

Dr. Lane examined Johnson on December 11, 2009.  (R. 301-02).  Johnson reported that she had quit her previous job and was now working for a movie theater.  (R. 301).  Lab test results showed increased indications of lupus, and Dr. Lane continued a diagnosis of UCTD, but commented that she was "concerned this may represent lupus."  (R. 302).  She said that Johnson was anxious to return to the care of a rheumatologist once she had insurance coverage.  *Id.*

On February 25, 2010, Dr. Lane wrote a letter "To Whom It May Concern," stating that Johnson had been diagnosed with UCTD, which was a chronic condition "likely to require lifelong management, including medications and medical care."  (R. 300).

On March 12, 2010, Johnson reported to Dr. Lane that she had run out of Mobic the week before the appointment, and she felt achy and not well.  (R. 297-99).  She reported pain in her wrists, hands, low back, ankles, and feet, and she was working about 20 hours a week due to not feeling well.  (R. 297).  Johnson said that her energy level was low.  *Id.*  Dr. Lane's assessments were UCTD and fatigue, and she wrote that she believed Johnson needed the care of a rheumatologist and "more aggressive management" of her disease.  (R. 298).

Johnson returned to Dr. Newell at Warren Clinic on May 3, 2010.  (R. 333-35).  Johnson said that she had pain in her knees, back, hips, and fingers.  (R. 333).  She experienced fatigue, difficulty concentrating, and occasional numbness in her arms.  *Id.*  Johnson's hand pain caused her to lose her grip and to be unable to write.  *Id.*  Twice a week Johnson's fingers would swell, making it difficult for her to use a keyboard.  *Id.*  She had difficulty climbing stairs.  *Id.*  On examination, Johnson appeared to be uncomfortable, and she had moderate pain with range of motion in her cervical and lumbar spine.  (R. 334).  She had mild pain in her shoulders, and tenderness of her hips, knees, and ankles.  *Id.*  Her knees and ankles were also swollen.  *Id.*  She had some tenderness and swelling in her hands, as well as reduced range of motion of her fingers.

6

*Id.* Eighteen fibromyalgia tender points were positive. *Id.* Dr. Newell's impressions were UCTD, other specified inflammatory polyarthropathies, and chronic fatigue. *Id.*

At Johnson's appointment with Dr. Lane at the OU Clinic on May 25, 2010, she reported that she had increased pain, difficulty sleeping, and migraine headaches. (R. 289-91). Dr. Lane wrote that Johnson's headaches were infrequent, but debilitating. (R. 291). Dr. Lane's assessments were UCTD, headaches, and fatigue. *Id.*

Johnson returned to Dr. Lane on July 26, 2010 and assessments continued to be UCTD, headaches, and fatigue. (R. 286-88). When Johnson saw Dr. Lane on September 27, 2010, she said that there was improvement in her aches and pains. (R. 410-12). Dr. Lane continued to assess UCTD, but she wrote that this was "clinically quiescent as far as I can tell." (R. 411-12).

Dr. Lane evaluated Johnson on December 13, 2010. (R. 403-05). Johnson complained of intermittent swelling in her right hand. (R. 403). Johnson reported increased fatigue and a recent day when she "couldn't move," which she believed was due to working extra hours. *Id.* Dr. Lane continued her diagnoses of UCTD, fatigue, and headache, and added irritable bowel syndrome. (R. 404-05).

On March 8, 2011, Dr. Lane informed Johnson that her recent blood test showed no evidence of lupus. (R. 434-35). On June 15, 2011, Dr. Lane advised Johnson that new laboratory results were "supportive of a lupus diagnosis." (R. 430-31). Dr. Lane suggested that she see a rheumatologist or consider a trial of Plaquenil if she could not see a rheumatologist due to lack of insurance coverage. (R. 430).

On July 25, 2011, Johnson reported to Dr. Lane that she had some days when she had "slightly more energy" and might have slightly less joint pain.  (R. 426-28).  On examination, Dr. Lane said that Johnson looked "the best I have seen her in a long time."  (R. 427).  Dr. Lane assessed Johnson with lupus erythematosus and fatigue.  (R. 428).

Johnson presented to William Surbeck, M.D. on November 16, 2011.  (R. 441-42).  On examination, Johnson had a butterfly rash, swelling and tenderness in her right hand and tenderness in her left hand.  (R. 441).  His assessment was systemic lupus erythematosus, and he prescribed Plaquenil and prednisone.  (R. 441-42).

The administrative transcript includes an application for a handicapped parking placard that was signed by Dr. Newell apparently in May 2010.  (R. 437).  Dr. Newell had checked a box on the form indicating that Johnson was "severely limited in [her] ability to walk due to an arthritic, neurological, or orthopedic condition."  *Id.*

On June 5, 2010, agency consultant Patrice Wagner, D.O. performed a physical evaluation of Johnson.  (R. 276-81).  Johnson told Dr. Wagner that she experienced severe fatigue, chronic general pain, and debilitating migraine headaches three times a month.  (R. 276).  Johnson said that her medications worked "fairly well," but her symptoms increased when she had increased stress.  *Id.*  On examination, Dr. Wagner noted that Johnson was able to walk about the examination room easily and her gait was stable at an appropriate speed.  (R. 277).  Johnson had full range of motion of her spine, and she moved all extremities well.  *Id.*  Her grip strength and great toe strength were equal bilaterally and were rated five out of five.  *Id.*  Dr. Wagner's assessments were lupus, migraine headaches, and depression.  *Id.*

Agency consultant Minor W. Gordon, Ph.D, conducted a psychological evaluation of Johnson on July 9, 2010.  (R. 282-85).  Johnson reported that her lupus caused her to hurt all

over and made her feel tired all the time.  (R. 282).  She had never been treated by any mental

health professional.  *Id.*  She said that on days when she did not work, she stayed in bed and

sometimes went swimming.  *Id.*  She had a friend who did most of the cooking, cleaning, and

grocery shopping.  *Id.*  Dr. Gordon noted that Johnson walked without difficulty, but her level of

motor activity was less than normal.  (R. 283).  She had difficulty initiating and maintaining

sleep, but her medication helped.  *Id.*  She said that her energy level was " very steady" when she

took her phentermine.  *Id.*  Johnson's affect reflected a mildly depressed mood.  *Id.*  Johnson's

memory was adequate, her intelligence was average or above-average, and her social-adaptive

behavior was within normal limits.  *Id.*  Dr. Gordon said that Johnson appeared to have some

problems with mild depression, but that those problems alone should not preclude her from

gainful employment.  *Id.*  Dr. Gordon's Axis I[7] diagnosis was mild depression, not otherwise

specified, secondary to general medical condition.  (R. 284).  He scored Johnson's Global

Assessment of Functioning ("GAF")[8] as 70.  *Id.*

Agency nonexamining consultant Burnard Pearce, Ph.D. completed a Psychiatric Review

Technique Form on August 4, 2010, concluding that Johnson's mental impairments were not

---

[7] The multiaxial system "facilitates comprehensive and systematic evaluation."  Am. Psych. Assn., Diagnostic and Statistical Manual of Mental Disorders 27 (Text Rev. 4th ed. 2000) (hereinafter "DSM IV").

[8] The GAF score represents Axis V of a Multiaxial Assessment system.  *See* DSM IV at 32-36.  A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning."  *Id.* at 32.  The GAF scale is from 1-100.  A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas."  *Id.* at 34.  A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  *Id.*  A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning."  *Id.*

severe.  (R. 341-54).  For Listing 12.04, Dr. Pearce noted Johnson's mood disturbance with

depressive syndrome and decreased energy.  (R. 344).  For the "Paragraph B Criteria,"[9] Dr.

Pearce found that Johnson had mild restriction of activities of daily living, mild difficulties in

maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or

pace, with no episodes of decompensation.  (R. 351).  In the "Consultant's Notes" portion of the

form, Dr. Pearce summarized Dr. Gordon's report in some detail, and he summarized Johnson's

activities of daily living.  (R. 353).

      Nonexamining agency consultant Katherine Scheirman, M.D., completed a Physical

Residual Functional Capacity Assessment on August 30, 2010.  (R. 357-64).  For exertional

limitations, Dr. Scheirman determined that Johnson had the exertional ability to perform

sedentary work, with the additional information that Johnson could lift 5 to 9 ½ pounds

frequently and could only stand or walk for a maximum of 2 hours during an 8-hour workday.

(R. 358-59).  In the section for narrative explanation, Dr. Scheirman summarized several treating

examinations, including Dr. Newell's rheumatology examination of January 25, 2008.  *Id.*  Dr.

Scheirman noted the positive ANA panel from laboratory results on March 12, 2010.  (R. 359).

Dr. Scheirman also briefly summarized the consultative examination reports of Dr. Wagner and

Dr. Gordon.  *Id.*  Dr. Scheirman briefly summarized Johnson's activities of daily living.  *Id.*  Dr.

Scheirman concluded that Johnson's reports of headaches were inconsistent, and she said that

---

[9] There are broad categories known as  the "Paragraph B Criteria" of the Listing of
Impairments used to assess the severity of a mental impairment.  The four categories are (1)
restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3)
difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of
decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R.
Part 404 Subpt P, App. 1 ("Listings") § 12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264,
1268-69 (10th Cir. 2008).

Johnson's reports of limitations were only partially supported by the medical evidence.  *Id.*  She found that no postural, manipulative, visual, communicative, or environmental limitations were established.  (R. 359-64).  Nonexamining agency consultant Luther Woodcock, M.D., completed a second Physical Residual Functional Capacity Assessment on February 7, 2011 that was essentially the same as the assessment of Dr. Scheirman.  (R. 417-24).

### Procedural History

On April 22, 2010, Johnson filed applications for Title II disability insurance benefits and for Title XVI supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.*  (R. 135-41).  Johnson alleged onset of disability as of November 1, 2009.  (R. 135). The applications were denied initially and on reconsideration.  (R. 69-77, 83-88).  A hearing before ALJ Richard Kallsnick was held on December 6, 2011.  (R. 30-61).  By decision dated February 15, 2012, the ALJ found that Johnson was not disabled.  (R. 10-19).  On February 2, 2013, the Appeals Council denied review of the ALJ's findings.  (R. 1-6).  Thus, the decision of the ALJ represents a final decision for purposes of this appeal.  20 C.F.R. §§ 404.981, 416.1481.

### Social Security Law and Standard Of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability

claim.  20 C.F.R. § 404.1520.[10]  *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir.

2009) (detailing steps).  "If a determination can be made at any of the steps that a claimant is or

is not disabled, evaluation under a subsequent step is not necessary."  *Lax*, 489 F.3d at 1084

(citation and quotation omitted).

     Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported

by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v.*

*Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

     Substantial evidence is such evidence as a reasonable mind might accept as adequate to

support a conclusion.  *Wall*, 561 F.3d at 1052 (quotations and citations omitted).  Although the

court will not reweigh the evidence, the court will "meticulously examine the record as a whole,

including anything that may undercut or detract from the ALJ's findings in order to determine if

the substantiality test has been met."  *Id.*

_____

     [10] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

## Decision of the Administrative Law Judge

In his decision, the ALJ found that Johnson met insured status requirements through September 30, 2010.  (R. 12).  At Step One, the ALJ found that Johnson had not engaged in any substantial gainful activity since her alleged onset date of November 1, 2009.  *Id.*  At Step Two, the ALJ found that Johnson had severe impairments of lupus and migraines.  *Id.*  The ALJ found that Johnson's medically determinable mental impairment of depression was nonsevere.  (R. 13).  At Step Three, the ALJ found that Johnson's impairments did not meet any Listing.  (R. 13-14).

The ALJ found that Johnson had the RFC to perform the full range of sedentary work.  (R. 14).  At Step Four, the ALJ determined that Johnson was capable of performing past relevant work.  (R. 17).  As an alternative finding at Step Five, the ALJ found that there were a significant number of jobs in the national economy that Johnson could perform, taking into account her age, education, work experience, and RFC.  (R. 17-18).  Therefore, the ALJ found that Johnson was not disabled at any time from November 1, 2009 through the date of his decision.  (R. 19).

## Review

Johnson asserts that the ALJ failed to consider all of the evidence, failed to properly consider her credibility, and failed to consider the effects of her migraine headaches.  The Court agrees that the ALJ's recitation of the medical evidence is impermissibly incomplete in violation of legal requirements.  For this reason, the Court reverses and remands the ALJ's decision.

It is oft-stated law in this circuit that an ALJ must discuss more than just the evidence favorable to an opinion that a claimant is not disabled:

> [I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.

*Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).  It is error to ignore evidence that would

support a finding of disability while highlighting the evidence that favors a finding of

nondisability.  *Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007).

Here, the ALJ's recitation of the medical evidence is impermissibly one-sided.  While the

ALJ stated that he considered all of the evidence, and many Tenth Circuit cases state that the court

will take the ALJ at his word,[11] there are also many cases that criticize ALJs for a "selective"

version of the facts or a version that involves "picking and choosing" from medical reports.

*Chapo v. Astrue*, 682 F.3d 1285, 1292 (10th Cir. 2012); *Reveteriano v. Astrue*, 490 Fed. Appx.

945, 947-48 (10th Cir. 2012) (unpublished); *Groberg v. Astrue*, 415 Fed. Appx. 65, 69 (10th Cir.

2011) (unpublished).  The Court finds that the ALJ's use of only those facts gleaned from the

medical record that supported a finding of nondisability is so extreme that it violates the legal

requirement as recited in *Clifton* that the ALJ must discuss uncontroverted evidence that weighs

in favor of a finding of disability as well as probative evidence that he rejects.  *See Weigel v.

Astrue*, 425 Fed. Appx. 706, 710 (10th Cir. 2011) (unpublished) (selective discussion by ALJ did

not demonstrate that he considered all of the evidence and led to improper consideration of

claimant's RFC).

Here, the ALJ acknowledged only five of Johnson's contacts with Dr. Lane or the OU

Clinic: May 15, 2009; May 22, 2009; August 7, 2009; December 11, 2009; and July 25, 2011.  (R.

16-17).  In addition to the five acknowledged contacts, Johnson saw Dr. Lane on nine other

occasions:  June 5, 2009; October 9, 2009; March 12, 2010; May 25, 2010; July 26, 2010;

September 27, 2010; December 13, 2010; March 8, 2011; and June 15, 2011.  (R. 286-91, 297-99,

---

[11] *See, e.g., Wall*, 561 F.3d at 1069; *Best-Willie v. Colvin*, 514 Fed. Appx. 728, 738 (10th Cir. 2013) (unpublished); *Lundgren v. Colvin*, 512 Fed. Appx. 875, 878 (10th Cir. 2013) (unpublished).

308-10, 314-16, 403-05, 410-12, 434-35).  The ALJ also omitted any mention of the January 25,

2008 rheumatology evaluation of Johnson by Dr. Newell, presumably because it was before the

alleged onset date of November 1, 2009.  (R. 336-37).  The ALJ also failed to note the evaluation

of William Surbeck, M.D., who apparently was seen by Johnson because he was a specialist.  (R.

441-42).

By omitting any mention of these contacts of Johnson with physicians, the ALJ has

omitted evidence that is both uncontroverted and probative.  For example, Dr. Lane said on June

5, 2009, that laboratory results were suggestive of autoimmune disease.  (R. 314-16).  On October

9, 2009, Johnson reported to Dr. Lane that she had started a more fast-paced job and that change

had increased her pain.  (R. 308).  On December 11, 2009, Dr. Lane stated that lab test results

showed increased signs of lupus.  (R. 302).  On March 12, 2010, Johnson reported to Dr. Lane

that she was only working 20 hours because she was not feeling well and that her energy level was

low.  (R. 297).  Dr. Lane assessed fatigue and stated that she believed Johnson needed the care of

a rheumatologist and more aggressive management of her disease.  (R. 298).  On June 15, 2011,

Dr. Lane told Johnson that laboratory test results were supportive of a lupus diagnosis, and she

suggested that Johnson consult a rheumatologist.  (R. 430).  Dr. Surbeck, on November 16, 2011,

noted the butterfly rash that is a sign of lupus.[12]  (R. 441-42).

Additionally, the ALJ was impermissibly one-sided in his description of Johnson's July

25, 2011 visit with Dr. Lane.  (R. 17).  The ALJ said that Johnson reported "that she had more

energy, and that her joint pain was less."  *Id.*  What Dr. Lane's record actually states is:

"[Johnson] has had a couple of days when she felt slightly more energy and the joint pains may be

---

[12] Dorland's Illustrated Medical Dictionary 1617 (31st ed. 2007).

slightly less." (R. 426).  The undersigned does not expect an ALJ's summary of medical records

to always be perfect, but the ALJ's summary of the July 25, 2011 office visit is so inaccurate as to

be misleading. *See Sitsler v. Astrue*, 410 Fed. Appx. 112, 117-18 (10th Cir. 2011) (unpublished)

(criticizing ALJ's mischaracterization of the evidence).  As the Tenth Circuit stated in a recent

unpublished case, "the ALJ's omissions here go beyond the merely technical and call into

question the ALJ's application of the appropriate legal standards." *Jones v. Colvin*, 514 Fed.

Appx. 813, 823-24 (10th Cir. 2013) (unpublished).

Because reversal is required due to the errors of the ALJ related to his discussion of the

medical evidence, the undersigned does not address the remaining contentions of Johnson.  On

remand, the Commissioner should ensure that any new decision sufficiently addresses all issues

raised by Johnson.

This Court takes no position on the merits of Johnson's's disability claim, and "[no]

particular result" is ordered on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir.

1993).  This case is remanded only to assure that the correct legal standards are invoked in

reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14

(10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

## CONCLUSION

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the

Commissioner denying disability benefits to Claimant for further proceedings consistent with this

Order.

Dated this 30th day of January, 2014.

_____

Paul J. Cleary
United States Magistrate Judge